IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| TERESA M. MEITL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-0557-CV-W-ODS |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for disability and supplemental security income benefits . The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in February 1965. She has earned her GED, received two years of vocational training in telecommunications, and has prior work experience as a cook, receptionist, phone installer, bartender, waitress, flagman, and cashier. In July 2003 she applied for Disability Insurance Benefits and Supplemental Security Income, alleging she became disabled effective April 15, 2001, due primarily to degenerative joint disease in her right knee. Plaintiff was seen at Truman Medical Center ("TMC") in September 2001 complaining of pain in her knee that began a few weeks prior, and she was diagnosed as suffering from a Baker's Cyst. Plaintiff was told to keep her knee immobile, take Motrin, and follow up with an orthopedist in a week. R. at 108-12. There is no record Plaintiff returned to see an orthopedist as instructed. Plaintiff returned to TMC in May 2002 complaining of pain in her ankle, but she left the waiting room before she could be examined and treated. R. at 113-18. Plaintiff went to Swope Parkway

Health Center ("Swope") on several occasions between July 2002 and October 2002, at which time she was given Motrin for her complaints of knee pain. R. at 141-48, 151-65.

In February 2003, Plaintiff returned to TMC complaining of pain in her left knee. She described the pain as worsening when she walked for long distances, but that ibuprofen had proved helpful in alleviating the pain. Her range of motion was reduced by ten degrees and swelling was evident. X-rays revealed "severe bon on bone medial compartment degeneration as well as moderate patellofemoral arthrosis" but she still exhibited "relatively good joint space." She was instructed to lose weight (she was five feet nine inches tall and weighed 259 pounds) and take glucosamine and anti-inflammatories. R. at 122. In March, Plaintiff returned to Swope and was given Motrin. R. at 132-34.

On June 7, 2003, Plaintiff returned to TMC complaining of right knee pain. However, she failed to respond when called from the waiting room fifteen minutes after her arrival. R. at 127. Four days later Plaintiff went to Swope and obtained an injection in her knee. R. at 132. She obtained another injection approximately two weeks later. R. at 130.

Plaintiff next went to Swope in August 2004, at which time she was provided Vioxx and Celebrex. R. at 176-77. In October and November, Plaintiff reported that she was "doing ok" or "doing well." R. at 171, 228. However, she returned in January 2005 complaining of pain in both knees, and she was diagnosed as suffering from severe osteoarthritis in both knees. R. at 226. Later that month, Plaintiff went to Baptist-Lutheran Medical Center for physical therapy. Her range of motion was reduced by thirty to thirty-five degrees in both knees, and her strength was fifty percent of normal. She reported that walking and climbing stairs made the pain worse, but medication helped decrease the pain. A program of physical therapy was developed. R. at 222.

Plaintiff first sought mental health treatment in April 2004. Plaintiff complained of depression accompanied by fits of crying and anger. Her current GAF score was assessed (by Dr. Nalu Reddy) at 40. R. at 187-94. Upon returning sixty days later, Plaintiff reported similar symptoms and was diagnosed as suffering from posttraumatic

stress disorder, cocaine abuse (in remission for sixty days; Plaintiff last used crack cocaine the week before her April visit), and health, living situation, occupational and financial difficulty. Her GAF score was assessed to be 30. Plaintiff was prescribed Lexapro (an anti-depressant, instructed to continue outpatient therapy, and to return in three weeks. R. at 180. At that visit, Plaintiff reported she was "feeling good and no complaints" and the medication was working. Her GAF score increased to 40. R. at 179. On September 23, 2004, Plaintiff reported feeling depressed "once in a while . . . but otherwise I am okay." She was still seeing a therapist on an outpatient basis, and her Lexapro was increased. In addition, she was encouraged to exercise and lose weight. Her GAF score was listed as 35. R. at 178.

      At the time of the hearing Plaintiff had been living in a group home for the preceding five months. Her room and board is paid by the State of Missouri. Prior to moving into the group home, Plaintiff lived in various women's shelters or on the streets of Kansas City. R. at 280. She was taking Trazadone to help with sleeping, Flexeril for muscle spasms, Celebrex for pain and Lexapro for depression. She also took medication to treat high blood pressure. R. at 258-59. She weighed 274 pounds and declared she overate because she was depressed. R. at 259. She described the most severe pain she experiences as being in her left knee. She testified she elevates her legs for an hour a day by lying in her bed and putting her legs on a stack of pillows. R. at 260. Her doctor advised her to use a cane, which she uses to help her walk. Her knee buckles or locks once or twice a week, occasionally causing her to fall. R. at 262. She is a candidate for knee replacement surgery, but she stated her doctors are waiting until she gets older and she loses weight. R. at 262. Plaintiff testified she can stand for about five or ten minutes before the pain requires her to sit down, and can take no more than four steps without having to stop and rest. R. at 262-63. She also testified she can sit for only thirty minutes at a time before her hips start hurting and she needs to get up. R. at 263-64.

      With regard to her mental condition, Plaintiff testified that she experiences flashbacks to incidents of molestation from her childhood once or twice a week, crying spells two to three times a week (lasting from ten to sixty minutes), a loss of interest in

3

activities (such as bowling and throwing darts), and spends the majority of her time isolated, usually in bed.  She also has nightmares caused by the childhood incidents, which wake her and make it difficult to sleep.  She occasionally has suicidal thoughts and allows her personal hygiene and care to go unattended.  R. at 270-74.  The group home provides housekeeping and meal services, and her only responsibility is to make her bed and keep her room picked up; Plaintiff is able to perform these tasks.  She also attends self-improvement classes during the day.  Plaintiff testified she was compliant with the physical therapy program suggested by Baptist-Lutheran Medical Center and that it was helpful; however, she stopped going after seven visits because that was all Medicaid would pay for.  R. at 288.

The ALJ solicited testimony from a Vocational Expert ("VE").  The VE was first asked to assume a person of Plaintiff's age, education and experience who could perform sedentary work but could lift only ten pounds occasionally and less than ten pounds frequently, stand or walk for two hours a day, sit for six hours a day, required an option to sit or stand, needed to avoid heights, stooping, crawling and crouching, could have only limited contact with the public and supervisors, and was limited to routine and repetitive work.  The VE testified that such a person could not return to their past relevant work, but there was other work that could be performed in the national economy.  The VE also testified that such a person could find work if they had to spend an hour a day with their legs elevated, but only if that hour could be spread out over the course of the day.  R. at 293-97.  Upon further questioning, the VE testified that no job would allow an employee to sleep for two hours during the day, lie in bed with their legs elevated, or elevate their legs at will.

The ALJ concluded Plaintiff has an impairment or impairments that is severe but does not equal a listed impairment.[1]  He further found Plaintiff lacks the residual functional capacity to return to her past work but retains the capacity to perform other work in the national economy.  In reaching this decision, and in ascertaining Plaintiff's

---

[1] During the administrative hearing, Plaintiff argued her condition met or equaled a listed impairment.  She does not reassert that argument in this proceeding, so there is no need to consider it.

4

residual functional capacity, the ALJ noted the discrepancies between the extent of Plaintiff's physical pain and discomfort as described to her doctors and as described in her testimony. The ALJ also noted that while the medical records supported the existence of a severe medical problem, they did not support Plaintiff's testimony about the degree of her limitations.

## II.  DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion."  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced.  The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just

5

> one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> > 1. The claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain
> > 3. precipitating and aggravating factors;
> > 4. dosage, effectiveness and side effects of medication;
> > 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir. 1994). Plaintiff's doctors told her to take over-the-counter medication and mild prescription medication; this course of treatment is inconsistent with subjective complaints of disabling pain. See Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994). Plaintiff told her doctors her condition was effectively treated with medication, and also admitted to the ALJ that physical therapy helped alleviate her pain. Plaintiff never told her doctors the pain was as debilitating as she described in her testimony. Plaintiff also has a rather poor recent work record; as the ALJ observed, she was not working during time periods she testified she could have done so. Finally, while Plaintiff complied with the physical therapy regimen, she did not follow her doctor's advice to exercise and lose weight. This is significant not only in assessing Plaintiff's credibility, but these instructions are contrary to a medical determination that Plaintiff should be expected to limit her activities.

Plaintiff contends the ALJ erred in failing to defer to Dr. Reddy's assessment of Plaintiff's GAF score. Generally speaking, a treating physician's opinion is entitled to

6

deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Assuming without deciding that Plaintiff's three visits entitles Dr. Reddy to be considered a treating physician, the record reflects justifiable grounds for discounting her assessment. A GAF score below 40 suggests serious, major impairments; a score of 30 suggests behavior that "is considerably influenced by delusions or hallucinations, serious impairment in communication or judgment, or inability to function in almost all areas." These scores are inconsistent with the conservative treatment Dr. Reddy prescribed for Plaintiff. They are also inconsistent with the information Plaintiff relayed to Dr. Reddy. It may be that Plaintiff's GAF score was low at the time of her first visit – which was shortly after she used cocaine – but this does not mean her GAF score was fixed at that number forever. Finally, the ALJ observed Dr. Reddy relied heavily on transitory factors such as lack of money and lack of employment in ascertaining Plaintiff's GAF score; consequently, the GAF score is not a fair indicator of the limitations imposed by Plaintiff's depression.

### III. CONCLUSION

For these reasons, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

DATE: March 8, 2006

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT